**SO ORDERED.**

**SIGNED this 7 day of July, 2016.**



_____
**Joseph N. Callaway**
**United States Bankruptcy Judge**

_____

# UNITED STATES BANKRUPTCY COURT
# EASTERN DISTRICT OF NORTH CAROLINA
# RALEIGH DIVISION

| | |
|---|---|
| IN RE: | CASE NO. |
| DREW TRANSPORTATION SERVICES, INC. | 16-02609-5-JNC |
| DEBTOR | |

### MEMORANDUM OPINION REGARDING ORDER
### APPOINTING CHAPTER 11 TRUSTEE

The matter before the court is the Emergency Motion to Appoint a Chapter 11 Trustee or in the Alternative an Order Converting the Case to a Chapter 7 Proceeding filed by the Bankruptcy Administrator on June 14, 2016. Dkt. 42 (the "Emergency Motion"). A Response in Opposition was filed by the Debtor on June 22, 2016. Dkt. 64 (the "Response"). Pursuant to an order reducing response time issued on June 15, 2016, hearings on the Emergency Motion, along with several other pending motions, were held in Greenville, North Carolina on June 23 and June 27, 2016.  C. Scott Kirk, Esq. appeared on behalf of the United States Bankruptcy Administrator, and Philip Sasser, Esq. appeared for the Debtor. Evidence was presented at the June 23 hearing, but no evidence was presented or required at the June 27 hearing as the Debtor, through counsel, orally

moved to dismiss its chapter 11 case. After consideration of the pleadings, arguments of counsel, evidence presented at hearing, and other matters of record, the court denied the motion to dismiss from the bench and announced its decision to allow the Emergency Motion in part and appoint Mr. Walter Hinson, Esq. as the chapter 11 trustee in the case, declining to convert the case to a proceeding under chapter 7 at that time. A short order appointing Mr. Hinson as chapter 11 trustee was entered shortly thereafter on June 27, 2016. Dkt. 68 (the "Trustee Order"). This Memorandum Opinion serves to further explain the reasons and basis for the court's decision.

## JURISDICTION

This matter is a core proceeding pursuant to 28 U.S.C. § 157, and this court has jurisdiction pursuant to 28 U.S.C. §§ 151, 157, and 1334. This court has the authority to hear this matter pursuant to the General Order of Reference entered August 3, 1984 by the United States District Court for the Eastern District of North Carolina.

## BACKGROUND

Drew Transportation Services, Inc. (the "Debtor") filed a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code on May 16, 2016 at 5:45 p.m. Dkt. 1. The Debtor is a North Carolina corporation founded and incorporated by John Andrew Pearson, III ("Mr. Pearson") in 2008. He is the sole owner of the company and serves as its president. The Debtor provides a variety of transportation services, maintains a fleet of approximately sixty vehicles, and employs sixty-six individuals as either W-2 or contract employees. The bulk of the Debtor's income, about eighty percent, is derived from a contract with the Wake County Public School System ("WCPSS") to transport several hundred students a day during the school year. The Debtor provides few if any transportation services to WCPSS during the summer months when traditional schools are not in session.

In addition to the WCPSS contract, the Debtor operates a "Reservation Center," which offers transportation services for companies under contract and individual consumers on an as-needed basis, primarily providing shuttle and limousine transportation service to and from area airports. Contracts with other entities are maintained by the Debtor through the Reservation Center, such as shuttle services for employees of United Airlines, Inc. and MetLife, Inc., and transportation to day camps for local individuals affiliated with Volunteers for America. The Reservation Center accounts for the remaining approximately twenty percent of the Debtor's income.

WCPSS previously paid the Debtor a rate of $25.00 per transported student, but recently reduced its rate to $16.50 per student. In addition, the daily number of students served by the Debtor fluctuated between six hundred and eight hundred over the past year, creating significant variances in the Debtor's costs. According to Mr. Pearson, the decreased per-student rate and inconsistent volume resulted in increased costs and drastic income loss for the Debtor, which partially precipitated the filing of its chapter 11 petition. However, he maintained that the primary impetus for the chapter 11 filing was to stay the pending execution of a state court judgment held by Traveler's Property Casualty Company of America in an amount exceeding $200,000.00 for unpaid insurance premiums. Execution of the judgment by the Wake County Sheriff's Office against the Debtor's property, including vehicles in its fleet, was imminent at the time of filing. To stave off the forced liquidation of its key assets, the Debtor filed its chapter 11 petition.

## CASH COLLATERAL ORDERS AND PROJECTIONS

The Debtor sought to continue its business operations in chapter 11 and filed an Emergency Motion to Use Cash Collateral on May 17, 2016, Dkt. 9 (the "Cash Collateral Motion"), which was heard by the court on May 19, 2016 (the "Cash Collateral Hearing"). A proposed budget for use of certain cash collateral in the regular operation of Debtor's business was approved by the

court in the Interim Order Granting in Part Motion to Use Cash Collateral dated May 20, 2016. Dkt. 17 (the "Interim Cash Collateral Order"). Within the budgetary confines of the Interim Cash Collateral Order, and as later amended, the Debtor was permitted to continue its business operations as a chapter 11 debtor-in-possession pursuant to 11 U.S.C. § 1107.

The Cash Collateral Motion sought approval of a thirty-day operating budget through June 16, 2016. However, because of service and budget concerns raised at the Cash Collateral Hearing, the court approved only a fourteen day budget for the Debtor, and required it to provide further details and service upon creditors. The return date for continued use of cash collateral was set for May 31, 2016, which was subsequently extended to June 7, 2016 (the "Second Cash Collateral Hearing"). The Second Cash Collateral Hearing resulted in the Second Interim Order Granting Motion to Use Cash Collateral dated June 10, 2016. Dkt. 34 (the "Second Cash Collateral Order"). The Second Cash Collateral Order permitted the Debtor to use cash collateral within the confines of a line-item budget set forth therein for the full month of June 2016. A deviation of not more than five percent for any line-item category was permitted.

Approval of the budgets in the Interim Cash Collateral Order and Second Cash Collateral Order was based on the Cash Collateral Motion and its attachments, testimony tendered at both hearings, and the Schedules and Statements filed in the case on May 31, 2016, Dkt. 23 (the "Original Schedules"), including the Statement of Financial Affairs (the "SOFA") found in the Original Schedules beginning at page 23. The Original Schedules and SOFA were signed by Mr. Pearson as the authorized representative of the Debtor, Dkt. 23 at 1, 33, and were accordingly relied upon by the court as truthful and accurate in its consideration of these matters.[1]

---

[1] Official Form 202, "Declaration Under Penalty of Perjury for Non-Individual Debtors," provides a list of nine schedules and statements that a corporate debtor representative is required to verify by

4

At the Cash Collateral Hearing, Mr. Pearson testified under oath that the Debtor expected to receive approximately $217,000 in income from WCPSS and around $27,000 under private service contracts provided through its Reservation Center for a total of about $244,000 in projected income between May 16 and June 30, 2016.[2] He further testified that the Debtor anticipated receiving the WCPSS income during this time in four roughly equal payments of about $53,000 each every two weeks. Mr. Pearson testified that the Debtor would not provide services to WCPSS during the summer months while school was not in session, resulting in little income for the Debtor from its major customer in July.

The Interim Cash Collateral Order allowed the Debtor to spend just under $100,000 on business operations in the last half of May, and the Second Cash Collateral Order permitted the use of slightly less than $150,000 for the period of June 2, 2016 to July 2, 2016, for a total of about $250,000 in acceptable expenditures over that time period.[3] Mr. Pearson testified that the budget was reasonable, even without income from WCPSS in July, as he anticipated that the Debtor's

---

checking various boxes to indicate that he or she has reviewed the information contained within each schedule or statement for accuracy under penalty of perjury. In the initial schedules, Mr. Pearson failed to check the relevant boxes, but his conformed signature appears on the form. *See* Dkt. 23 at 1. While he did not affirmatively confirm review of the schedules by checking the boxes, the court concludes that based on his conformed signature, his testimony, and submission of Official Form 202, Mr. Pearson intended to verify the information contained in the schedules as true and correct. More importantly, he did sign the SOFA as truthful and accurate under penalty of perjury, Dkt. 23 at 33, and the Amended Schedules filed June 16, Dkt. 53, contain an Official Form 202 at page 24 with his conformed signature and the proper boxes checked.

[2] A projected profit and loss statement was attached to the Cash Collateral Motion and was referenced by Mr. Pearson in his testimony. It projected income of $244,544.24 for the period of May 17, 2016 to June 16, 2016. Dkt. 9, Ex. D. Of this total figure, $217,288.19 was anticipated income from WCPSS and $27,256.05 from the Reservation Center. The profit and loss statement reflected anticipated expenses totaling $189,632.71 for the period of May 16, 2016 to June 16, 2016, resulting in projected positive net operating income of $54,911.53 for the Debtor in the first forty-five days of the case.

[3] The exact numbers are $98,142.52 in the Interim Cash Collateral Order and $145,664.52 in the Second Cash Collateral Order, but both orders permitted a 5% variance, so the aggregate sum of $250,000 in expenditures in the first forty-five days of the case is sufficient for purposes of the present matter.

operating expenses would decrease dramatically during the summer months when services for WCPSS temporarily ceased.

## OFFICER EMPLOYMENT

On June 6, 2016, the Debtor filed an Application to Employ Mr. John T. Bass of Bass Business Solutions, Dkt. 29 (the "Application to Employ"), as a chapter 11 financial consultant with control over business expenditures and budget compliance, among other things. Mr. Bass has served in a similar capacity in several cases before this court in the past. He began providing the contemplated services while the Application to Employ was pending. Mr. Bass testified that as part of his services, he and Mr. Pearson agreed that Mr. Bass would have sole authority to approve any and all expenditures by the Debtor before a check for any such expenditure could be issued.

The Debtor was scheduled to issue paychecks in its ordinary course of business on June 16, 2016. On June 13, 2016, three days before payroll and before approval of the employment of Mr. Bass could be considered by the court, Mr. Pearson demanded an immediate salary payment of $4,700.00 from the Debtor. However, the Application for Approval of Officer Compensation for Mr. Pearson filed by the Debtor on May 17, 2016, Dkt. 7 (the "Application for Officer Compensation") also had not yet been considered by the court and remained pending due to an objection filed by the Bankruptcy Administrator, Dkt. 33. The Application for Officer Compensation and objection thereto was set for hearing on June 23, 2016.

Because paychecks for the pay period ending June 15, 2016 were not scheduled to be issued by the Debtor until June 16, 2016, Mr. Bass informed Mr. Pearson that his salary payment request

6

could not be honored, as his compensation was not yet due.[4] Unbeknownst to and without the approval of Mr. Bass, a check for the full $4,700.00[5] made payable to Mr. Pearson was issued by another employee of the Debtor and cashed by Mr. Pearson the morning of June 14, 2016. In addition to the lack of court approval, preparing the check two days ahead of other employee payroll, and disregarding Mr. Bass's instruction not to issue it, no social security or other state or federal taxes and withholdings were taken, reserved, or matched from the unapproved $4700.00 salary check.[6] After learning of the issued and cashed check on June 14, Mr. Bass demanded that Mr. Pearson return the $4,700.00 to the Debtor due to its inappropriate nature, but Mr. Pearson failed to comply. Mr. Pearson then contacted his attorney, following which counsel for the Debtor informed Mr. Bass that his services were no longer required and that the Debtor would withdraw its Application to Employ. Mr. Pearson telephoned Mr. Bass on the evening of June 14 to inform him that he had been terminated, and the Debtor then withdrew the Application to Employ the next day. *See* Dkt. 43. As of the June 23 hearing, Mr. Pearson had not returned the funds, continuing to assert his belief that he was entitled to retain the payment.

The Bankruptcy Administrator was informed of the salary controversy and promptly filed a Motion to Show Cause on June 14, 2016 for several reasons, including improper compensation

---

[4] Officers of chapter 11 debtors are allowed to draw compensation for two pay periods before entry of an order allowing compensation; thereafter, officers may only receive payment as approved by the court. It appears that this salary request was for salary earned during the initial two pay periods and ordinarily would be regarded as routine. However, the method and manner in which the funds were demanded and paid was inappropriate for the reasons stated.

[5] According to the Application for Officer Compensation, Mr. Pearson's regular compensation consisted of a gross amount of $3,700 "per semi-monthly pay cycle." In its Response, the Debtor contends that Mr. Pearson only received $2,700, $1,000 less than he typically received as salary, for the first pay period after the filing of the petition on June 1, 2016. As a result, the Debtor believed that Mr. Pearson was entitled to an additional $1,000 during the second pay period. Dkt. 64 at ¶ 4.

[6] Consequently, the $4700 paid actually costs the Debtor about an additional ten to twelve percent and therefore exceeded the $3700 biweekly officer salary sought by the Debtor.

7

of an officer. Dkt. 41 (the "Motion to Show Cause"). The Motion to Show Cause alleges that the issuance of the salary check prior to the conclusion of the payroll period and without withholding required payroll taxes violated Local Bankruptcy Rule 4002-1(d). At the hearing, counsel for the Bankruptcy Administrator stated that compensation was not formally due to Mr. Pearson until June 16, 2016, which the Debtor did not contest.

In its Response, the Debtor asserts that its payment of Mr. Pearson's compensation was proper, although it admitted that the salary check was issued prematurely by three days. Dkt. 64. At the hearing, Mr. Pearson corroborated this contention, and testified that he first sought and received approval from Debtor's counsel prior to requesting the check for compensation. Further, Mr. Pearson stated that he completed the required employee payroll withholding tax forms prior to the issuance of the check, but did not verify whether taxes were withheld prior to cashing the check on June 14, 2016, an assertion that strains credibility given that converting the employees, including Mr. Pearson, to W-2 status with proper withholding had been discussed at length in conjunction with the Debtor's reorganization of its business and the check was still issued for a full "even-numbered" amount ($4700) obviously without withholding any payroll taxes being deducted. Finally, Mr. Pearson testified that the withdrawal of the Application to Employ Mr. Bass was not filed in retaliation for the demand by Mr. Bass that the salary check be immediately repaid. Rather, Mr. Pearson maintains that the Application to Employ Mr. Bass was withdrawn because Mr. Bass's actions exceeded his proposed capacity and contemplated authority, and Mr. Bass's demeanor in discussing the matter showed a lack of sufficient respect for Mr. Pearson. *See* Dkt. 64 at ¶ 3.

BANK ERROR FUNDS

Of greater concern to the court is another questionable matter discovered and reported by Mr. Bass, rather than Mr. Pearson or other employees of the Debtor: the failure to disclose and account for approximately $50,000 taken by Mr. Pearson from the bank account of the Debtor under strange circumstances immediately prior to the filing of the bankruptcy petition. On May 13, 2016, WCPSS issued a payment of $52,288.19 to the Debtor (the "Mid-May WCPSS Deposit"), the first of the four approximately $53,000 payments forecast for receipt by the Debtor from WCPSS in the projections attached to the cash collateral motions, even though this first payment was actually received pre-petition. When paid on the morning of May 13, 2016, the Mid-May WCPSS Deposit was deposited for immediate credit into the Debtor's pre-chapter 11 business operations account at Wells Fargo Bank bearing an account number ending in 4621 ("WFB Account 4621"). Mr. Pearson testified that he immediately withdrew $50,000 in cash and physically carried the money to a Bank of America branch one-quarter of a mile away where the Debtor maintained its pre-petition payroll account (bearing an account number ending in 2096) for immediate credit. The DTS payroll for the first half of May 2016 was then made with those funds by a series of checks to employees also dated May 13, 2016. The Debtor did not adjust the projected income listing in its Cash Collateral Motion to reflect that one of the forecast four WCPSS checks had been received and used pre-petition.

For unexplained reasons, Wells Fargo Bank deducted the $50,000 cash withdrawal not from WFB Account 4621, but rather from the bank account of another business owned by Mr. Pearson, Drew Auto Repair Service, LLC ("DARS"), bearing an account number ending in 4951

9

("WFB Account 4951"). DARS is not in bankruptcy.[7] Sometime on May 16, 2016, before the chapter 11 petition was filed at 5:45 p.m. that day, an employee of DTS notified Mr. Pearson that WFB Account 4621 still showed full credit for the Mid-May WCPSS Deposit. Mr. Pearson testified that he did not know at that time that Wells Fargo Bank had deducted the $50,000 from the DARS bank account in error. However, rather than determining if the $50,000 excess availability in the Debtor's bank account was a mistake or came from a deposit by a different source, Mr. Pearson immediately withdrew the $50,000 from WFB Account 4621 in the form of cash and checks in amounts totaling $40,000 to himself and $5,000 each to two employees of DTS, Mr. Dale Smith and Ms. Wanda Dalamora. *See* Hearing Ex. A at I.2.a., 1.2.b, and I.2.c. Mr. Pearson testified that the two $5,000 checks to Mr. Smith and Ms. Dalamora were immediately cashed and the cash in turn distributed to the Debtor's drivers to pay for gasoline and other vehicle operating expenses, and that he retained $10,000 in cash for the same purpose for the first week of the post-chapter 11 filing period. The existence of the cash was not reported in the Debtor's filings or at either the Cash Collateral Hearing or the Second Cash Collateral Hearing. No accounting has been provided to prove the actual use of the $20,000 in cash, and whether the funds, if used in the course of business operations, were consumed on May 16 in part or in whole, or were used post-petition and, if so, how much.[8]

---

[7] In the Debtor's SOFA, it lists Drew Auto Repair Service, LLC as an insider and provides that "Drew Auto Repair Service was created by the debtor's owner, John Pearson, to serve as the debtor's in-house mechanic shop. Though it is a separate corporate entity, the debtor and the repair shop co-mingle income and expenses to such an extent that to enumerate to (sic) various transfers would be impractical." Dkt. 23 at 26.

[8] Mr. Pearson testified at the June 23 hearing that the Debtor expended $57,000 monthly, or approximately $1,900 daily, on fuel for its vehicles while school was in session and the Debtor was transporting WCPSS students. Mr. Bass corroborated those amounts in his testimony. The court therefore finds it implausible and highly suspect that the Debtor spent $20,000 on fuel in the course of a single day. Even if all sixty vehicles were in use on May 16 and consumed $100 of gas each, the amount of pre-petition

Mr. Pearson testified on June 23 that he deposited the remaining $30,000 of the misdirected funds into his personal checking account at Bank of America on May 16, 2016, immediately prior to the chapter 11 filing. In its Response, the Debtor contends that Mr. Pearson returned the $30,000 to the Debtor in incremental transfers made between May 17, 2016 and May 31, 2016. The court notes that incremental post-petition payments were transferred electronically from Mr. Pearson's personal account to checking accounts at Bank of America belonging to the Debtor with account numbers ending in 9026 and 2415,[9] but that the post-petition transfers total $26,200, not $30,000. *See* Dkt. 64, Ex. A.

## SCHEDULES AND STATEMENTS

The Debtor filed an accelerated chapter 11 petition on May 16, 2016 and did not file the Original Schedules until May 31, 2016. The $50,000 taken by Mr. Pearson from WFB Account 4621 immediately prior to the filing of the petition (including the cash purportedly held by him, Mr. Smith, and Ms. Dalamora at the time of filing) is not reflected in Schedule B as an asset of the Debtor. The sole hint of the existence of the funds is found in the Debtor's SOFA filed with the Original Schedules, Dkt. 23 at 25, as "non-business revenue" under Question 2.[10] There, the Debtor states only that between January 1, 2016 and the filing date, $50,000 was "… mistakenly deposited into Drew Auto Repair account and used to pay bills of debtor." While it may be true that the bank made an error in noting a withdrawal (not a deposit) of funds taken from DARS,

---

gas use would total $6,000, leaving $14,000 of cash unaccounted for as the Debtor's budget does not contain an entry of any amount of existing cash held for post-petition vehicle operation expenses.

[9] The two checking accounts at Bank of America with account numbers ending in 9026 and 2415 are listed on the Debtor's Original Schedule A/B filed on May 31, 2016. Dkt. 23 at 3.

[10] It is possible that these funds are also reflected in Schedule G/F as a $50,000 debt owed to Drew Auto Repair as "money owed" and a $52,000 debt owed to Wells Fargo labeled as "overdraft." *See* Dkt. 23 at 16, 20. The Wells Fargo entry was amended in the Amended Schedules to reflect the "overdraft" amount as $38,000. Dkt. 53 at 11. Like the description as "non-business revenue," neither of these entries accurately reflects the status of the $50,000 as of the petition date.

11

absolutely no suggestion is made in the Question 2 response or elsewhere in the SOFA that $50,000 was taken by Mr. Pearson *from the bank account of the Debtor* (not DARS) the same day before the chapter 11 case was filed and retained "off book" by him and other insiders of the Debtor, outside of the Bankruptcy Code's reporting and cash collateral process. The answer implies that the funds were received and spent some time earlier in 2016, rather than literally hours before the Debtor filed its chapter 11 petition. No revelation regarding the funds was made to the court at any hearing in the case prior to June 23. The court only learned about the existence of the $50,000 after it was discovered and reported by Mr. Bass to the Bankruptcy Administrator. The Debtor's cash collateral filings gave no indication of the existence of a cash gas fund or the return of misappropriated funds in the form of bank transfers and infusions from its owner.

For example, Question 30 of the SOFA, titled "Payments, distributions, or withdrawals credited or given to insiders," asks:

> Within 1 year before filing this case, did the debtor provide an insider with value in any form, including salary, other compensation, draws, bonuses, loans, credits, stock redemptions, and options exercised?

Dkt. 23 at 31. The Debtor failed to list or otherwise reference the $50,000 under this question. Instead, the Debtor, through Mr. Pearson, responded by declaring under penalty of perjury:

> Prior to the filing of this bankruptcy case, Mr. Pearson's monthly compensation consisted or $7,400 per month, plus $1,800 per month for his home mortgage payment, $300 for his home utility payment and $1,600 per month to pay for a nurse for his elderly mother.

*Id.* In particular, no mention of the $10,000 cash or $30,000 deposit personally taken by Mr. Pearson is listed as value provided, in any form, to an insider.

Additionally, Question 4 of the SOFA requires that the Debtor list in detail all "Payments or other transfers of property made within 1 year before filing this case that benefited any insider"

12

occurring within the year preceding filing of the case exceeding in the aggregate $6,245. Dkt. 23 at 26. The Debtor responded that Mr. Pearson received the benefit of four regular monthly payments made to finance automobiles in the aggregate amount of $1,592.85. Therefore, as previously stated, the only mention of the $50,000 is found under Part 1, Question 2 of the SOFA, as "non-business revenue." Mr. Pearson signed the SOFA to declare under penalty of perjury that it was materially and substantially truthful and accurate. Dkt. 23 at 33.

The unreported eve of bankruptcy $50,000 withdrawal was only discovered after Mr. Bass began his work. He correctly brought the matter to the attention of the Bankruptcy Administrator, who filed the Emergency Motion on June 14, 2016. The Debtor subsequently filed amended schedules and statements on June 16, 2016. Dkts. 52, 53, and 54 (collectively, the "Amended Schedules"). Incredibly, the $50,000, which was listed as "non-business revenue" in the SOFA, does not appear on the Amended Statement of Financial Affairs, Dkt. 52 at 6-15 (the "Amended SOFA") at all, as the reference to the money coming from DARS in Part 1, Question 2 disappeared. Also incredibly, the answers to Questions 4 and 30 of the Amended SOFA *were not changed* and remain the same as recited above even after discovery of the unreported funds. The Amended Schedules also do not hint as to the existence as of the petition date of the $20,000 in cash taken from the $50,000 (or any portion thereof) as an asset of the bankruptcy estate on Schedule A/B. Mr. Pearson declared under penalty of perjury that the Amended Schedules and the Amended SOFA were truthful and accurate. Dkt. 52 at 15, 17.

In short, the $50,000 appears only on the original SOFA and is not properly categorized elsewhere in the case schedules and reports. The lack of any mention of the $50,000, whether in the response to Question 2, Question 4, Question 30, or elsewhere on the Amended SOFA is particularly troubling to the court, as those funds were withdrawn from the Debtor's bank accounts

13

and controlled by Mr. Pearson (or disbursed in part to employees under his control and direction) immediately before the Debtor's bankruptcy filing.

## APPOINTMENT OF A TRUSTEE

Section 1104(a) of the Bankruptcy Code provides the court with authority to appoint a chapter 11 trustee in two circumstances:

> (1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or
>
> (2) if such appointment is in the interests of creditors, any equity security holders, and other interest of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

11 U.S.C. § 1104(a).

Ordering the appointment of a trustee is not undertaken lightly. "The appointment of a trustee in a chapter 11 case is an extraordinary remedy, and there is strong presumption in favor of allowing the debtor to remain in possession." *In re Tanglewood Farms, Inc. of Elizabeth City*, No. 10-06719-8-JRL, 2011 Bankr. LEXIS 624, at *4–5 (Bankr. E.D.N.C. Feb. 10, 2011) (citing *In re Heck's Props.*, 151 B.R. 739, 756 (S.D. W. Va. 1992)). The party seeking the trustee appointment has the burden of proving the grounds, whether gross mismanagement, fraud, or other cause by a standard of clear and convincing evidence. *Id.* at *5 (citing *Comm. of Dalkon Shield Claimants v. A.H. Robins Co.*, 828 F.2d 239, 242 (4th Cir. 1987)).

The court has the discretion to determine if the conduct of a chapter 11 debtor's officers and managers constitute the necessary "cause." *A.H. Robins*, 828 F.2d at 242. "The clearest examples [where appointment of a trustee is warranted] are those in which the debtor or its managers have engaged in serious fraud or dishonesty, or have grossly mismanaged the business."

14

7 COLLIER ON BANKRUPTCY ¶ 1104.2[1] (Alan N. Resnick & Henry J. Sommer, eds., 16th ed.). Once cause is found, the statute requires that a trustee be appointed. 11 U.S.C. § 1104(a) (where cause is found, "the court *shall* order the appointment of a trustee") (emphasis added).

The Bankruptcy Code has long sought to protect the "honest but unfortunate debtor" by providing "a new opportunity . . . and a clear field for future effort." *Local Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934) (citations omitted). To accomplish this, the Bankruptcy Code demands complete transparency and truthfulness from debtors from the outset of the filing of a petition. *See e.g.*, *In re Kestell*, 99 F.3d 146, 149 (4th Cir. 1996) ("The right of debtors to a fresh start depends upon the *honest and forthright* invocation of the Code's protections") (emphasis added); *In re Tully*, 818 F.2d 106, 110 (1st Cir. 1987) ("The statutes are designed to insure that complete, truthful, and reliable information is put forward at the outset of the proceedings, so that decisions can be made by the parties in interest based on fact rather than fiction").

To summarize, a debtor has a duty in bankruptcy to be truthful and demonstrate candor in its representations to the court and parties-in-interest. Omissions or misstatements regarding assets on schedules and statements are problematic and certainly cut against the notion of an honest debtor. *See In re Crawford*, Adv. Pro. No. 14-03219 (Bankr. W.D.N.C. June 9, 2016). Such omissions diminish the ability of the court and all parties in interest to fully evaluate the likelihood of a successful reorganization. In a case involving a chapter 11 debtor-in-possession, parties in interest need reassurance that the debtor-in-possession will operate the business honestly and will investigate and administer assets in accordance with the Code.

In this case, the Debtor's failure to properly classify or clearly disclose the $50,000 on the SOFA or Amended SOFA is a significant omission of material fact. Further, the Debtor failed to provide the court with any sort of accounting or other documentation as to the disposition of those

funds. Instead, Mr. Pearson merely stated that the $50,000 was used to pay the Debtor's bills and supply its fleet with gasoline. Mr. Pearson had multiple opportunities to set the record straight by providing appropriate truthful and revealing answers, including while testifying under oath. However, he chose in each instance to play fast and loose with the full disclosures required by law. The court can only conclude that Mr. Pearson did not report the Debtor's cash held by him and funds deposited in his personal bank account on the date of filing in order to conceal the misappropriated $50,000.

To compound matters, Mr. Pearson chose to pay himself $4,700.00 as salary before compensation for him was approved, and he failed to deduct from his "salary" any payroll withholding taxes. His untimely demand to be paid directly contravenes the orderly process for approval of insider compensation contemplated under the Bankruptcy Code. The premature compensation paid to Mr. Pearson, standing on its own, would not be sufficient to constitute cause to name a trustee as that matter could be cured under an appropriate disgorgement order. However, when combined with his pre-petition opportunistic conduct regarding the bank error funds and the lack of candid reporting in the Schedules and SOFA, Mr. Pearson demonstrates a clear propensity to treat the Debtor's assets as his own both pre-petition and post-petition, and a tendency to disregard the dictates of the Bankruptcy Code and the orders of this court. In summation, the circumstances leading to the $50,000 being taken by Mr. Pearson from WFB Account 4621 immediately prior to the petition filing could be construed as fraudulent conduct; at best, his failure to report the pre-petition taking and account for the post-petition disposition of the funds is a "dishonest act" sufficient to warrant the appointment of a chapter 11 trustee.

The court therefore finds that cause exists and it is in the best interest of the creditors and the estate to appoint a chapter 11 trustee pursuant to 11 U.S.C. §§ 1104(a)(1) and (2), as ordered in the Trustee Order.

**END OF DOCUMENT**